IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, | § § § § § § | No. 404, 2020<br><br>Court Below – Court of Chancery of the State of Delaware<br><br>No. 2018-0671-JTL |
| Plaintiff-Below, Appellant, | § § § | |
| v. | § § | |
| MARK ZUCKERBERG, MARC ANDREESSEN, PETER THIEL, REED HASTINGS, ERSKINE B. BOWLES, and SUSAN D. DESMOND-HELLMANN, | § § § § § § § | |
| Defendants-Below, Appellees | § § § | |
| and | § § | |
| FACEBOOK, INC., | § § § | |
| Nominal Defendant-Below, Appellee. | § § | |

Submitted:     June 30, 2021
Decided:       September 23, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery.  **AFFIRMED**.

P. Bradford deLeeuw, Esquire, DELEEUW LAW LLC, Wilmington, Delaware; Robert C. Schubert, Esquire, Willem F. Jonckheer, Esquire (argued), SCHUBERT JONCKHEER & KOLBE LLP, San Francisco, California; James E. Miller, Esquire, SHEPHERD FINKELMAN MILLER & SHAH, LLP, Chester, Connecticut; *Attorneys for Appellant United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund.*

Kevin R. Shannon, Esquire, Berton W. Ashman, Jr., Esquire, Tyler J. Leavengood, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Esquire (argued), Ryan A. McLeod, Esquire, Anitha Reddy, Esquire, Kevin M. Jonke, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Appellees Marc L. Andreessen, Erskine B. Bowles, Susan D. Desmond-Hellman, Reed Hasting, and Peter Thiel.*

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; George M. Garvey, Esquire, Laura Lin, Esquire, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Appellee Mark Zuckerberg.*

David E. Ross, Esquire, Garrett B. Moritz, Esquire, R. Garrett Rice, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Appellee Facebook, Inc.*

**MONTGOMERY-REEVES**, Justice:

In 2016, the board of directors of Facebook, Inc. ("Facebook") voted in favor of a stock reclassification (the "Reclassification") that would allow Mark Zuckerberg—Facebook's controller, chairman, and chief executive officer—to sell most of his Facebook stock while maintaining voting control of the company. Zuckerberg proposed the Reclassification to allow him and his wife to fulfill a pledge to donate most of their wealth to philanthropic causes. With Zuckerberg casting the deciding votes, Facebook's stockholders approved the Reclassification.

Not long after, numerous stockholders filed lawsuits in the Court of Chancery, alleging that Facebook's board of directors violated their fiduciary duties by negotiating and approving a purportedly one-sided deal that put Zuckerberg's interests ahead of the company's interests. The trial court consolidated more than a dozen of these lawsuits into a single class action. At Zuckerberg's request and shortly before trial, Facebook withdrew the Reclassification and mooted the fiduciary-duty class action. Facebook spent more than $20 million defending against the class action and paid plaintiffs' counsel more than $68 million in attorneys' fees under the corporate benefit doctrine.

Following the settlement, another Facebook stockholder—the United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("Tri-State")—filed a derivative complaint in the Court of Chancery. This new action

3

rehashed many of the allegations made in the prior class action but sought compensation for the money Facebook spent in connection with the prior class action.

Tri-State did not make a litigation demand on Facebook's board. Instead, Tri-State pleaded that demand was futile because the board's negotiation and approval of the Reclassification was not a valid exercise of its business judgment and because a majority of the directors were beholden to Zuckerberg. Facebook and the other defendants moved to dismiss Tri-State's complaint under Court of Chancery Rule 23.1, arguing that Tri-State did not make demand or prove that demand was futile. Both sides agreed that the demand futility test established in *Aronson v. Lewis*[1] applied to Tri-State's complaint.

In October 2020, the Court of Chancery dismissed Tri-State's complaint under Rule 23.1. The court held that *exculpated* care claims do not excuse demand under *Aronson's* second prong because they do not expose directors to a substantial likelihood of liability. The court also held that the complaint failed to raise a reasonable doubt that a majority of the demand board lacked independence from Zuckerberg. In reaching these conclusions, the Court of Chancery applied a three-part test for demand futility that blended the *Aronson* test with the test articulated in *Rales v. Blasband*.[2]

Tri-State has appealed the Court of Chancery's judgment. For the reasons provided below, this Court affirms the Court of Chancery's judgment. The second prong of *Aronson*

---

[1] 473 A.2d 805 (Del. 1984).
[2] 634 A.2d 927 (Del. 1993).

4

focuses on whether the derivative claims would expose directors to a substantial likelihood of liability. Exculpated claims do not satisfy that standard because they do not expose directors to a substantial likelihood of liability. Further, the complaint does not plead with particularity that a majority of the demand board lacked independence. Thus, the Court of Chancery properly dismissed Tri-State's complaint for failing to make a demand on the board.

Additionally, this Opinion adopts the Court of Chancery's three-part test for demand futility. When the Court decided *Aronson*, raising a reasonable doubt that the business judgment standard of review would apply exposed directors to a substantial likelihood of liability for care violations. The General Assembly's enactment of Section 102(b)(7) and other developments in corporate law have weakened the connection between rebutting the business judgment standard and exposing directors to a risk that would sterilize their judgment with respect to a litigation demand. Further, the *Aronson* test has proved difficult to apply in many contexts, such as where there is turnover on a corporation's board. The Court of Chancery's refined articulation of the *Aronson* standard helps to address these issues. Nonetheless, this refined standard is consistent with *Aronson*, *Rales*, and their progeny. Thus, cases properly applying those holdings remain good law.

5

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. The Parties and Relevant Non-Parties

Appellee Facebook is a Delaware corporation with its principal place of business in California.[3] Facebook is the world's largest social media and networking service and one of the ten largest companies by market capitalization.[4]

Appellant Tri-State has continuously owned stock in Facebook since September 2013.[5]

Appellee Mark Zuckerberg founded Facebook and has served as its chief executive officer since July 2014.[6] Zuckerberg controls a majority of Facebook's voting power and has been the chairman of Facebook's board of directors since January 2012.[7]

Appellee Marc Andreessen has served as a Facebook director since June 2008.[8] Andreessen was a member of the special committee that negotiated and recommended that the full board approve the Reclassification.[9] In addition to his work as a Facebook director, Andreessen is a cofounder and general partner of the venture capital firm Andreessen Horowitz.[10]

---

[3] App. to Opening Br. 19 (hereinafter, "A_").
[4] A19-20.
[5] A19.
[6] A20.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] A51.

Appellee Peter Thiel has served as a Facebook director since April 2005.[11] Thiel voted in favor of the Reclassification.[12] In addition to his work as a Facebook director, Thiel is a partner at the venture capital firm Founders Firm.[13]

Appellee Reed Hastings began serving as a Facebook director in June 2011 and was still a director when Tri-State filed its complaint.[14] Hastings voted in favor of the Reclassification.[15] In addition to his work as a Facebook director, Hastings founded and serves as the chief executive officer and chairman of Netflix, Inc. ("Netflix").[16]

Appellee Erskine B. Bowles began serving as a Facebook director in September 2011 and was still a director when Tri-State filed its complaint.[17] Bowles was a member of the special committee that negotiated and recommended that the full board approve the Reclassification.[18]

Appellee Susan D. Desmond-Hellman began serving as a Facebook director in March 2013 and was still a director when Tri-State filed its complaint.[19] Desmond-Hellman was the chair of the special committee that negotiated and recommended that the full board

---

[11] A21.
[12] *Id.*
[13] A57.
[14] *See id.*
[15] *Id.*
[16] A60.
[17] *See id.*
[18] *Id.*
[19] *See id.*

7

approve the Reclassification.[20]  In addition to her work as a Facebook director, Desmond-Hellman served as the chief executive officer of the Bill and Melinda Gates Foundation (the "Gates Foundation") during the events relevant to this appeal.[21]

Sheryl Sandberg has been Facebook's chief operating officer since March 2018 and has served as a Facebook director since January 2012.[22]

Kenneth I. Chenault began serving as a Facebook director in February 2018 and was still a director when Tri-State filed its complaint.[23] Chenault was not a director when Facebook's board voted in favor of the Reclassification in 2016.[24]

Jeffery Zients began serving as a Facebook director in May 2018 and was still a director when Tri-State filed its complaint.[25]  Zients was not a director when Facebook's board voted in favor of the Reclassification in 2016.[26]

### B.      Zuckerberg Takes the Giving Pledge

According to the allegations in the complaint, in December 2010, Zuckerberg took the Giving Pledge, a movement championed by Bill Gates and Warren Buffet that challenged wealthy business leaders to donate a majority of their wealth to philanthropic causes.[27]

---

[20] *Id.*
[21] A27.
[22] A46.
[23] *See id.*
[24] *See* A46; A41.
[25] *See* A46.
[26] *See* A46; A41.
[27] A23.

Zuckerberg communicated widely that he had taken the pledge and intended to start his philanthropy at an early age.[28]

In March 2015, Zuckerberg began working on an accelerated plan to complete the Giving Pledge by making annual donations of $2 to $3 billion worth of Facebook stock.[29] Zuckerberg asked Facebook's general counsel to look into the plan.[30] Facebook's legal team cautioned Zuckerberg that he could only sell a small portion of his stock—$3 to $4 billion based on the market price—without dipping below majority voting control.[31] To avoid this problem, the general counsel suggested that Facebook could follow the "Google playbook" and issue a new class of non-voting stock that Zuckerberg could sell without significantly diminishing his voting power.[32] The legal team recommended that the board form a special committee of independent directors to review and approve the plan and noted that litigation involving Google's reclassification resulted in a $522 million settlement.[33] Zuckerberg instructed Facebook's legal team to "start figuring out how to make this happen."[34]

---

[28] *Id.*
[29] A24.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

## C. The Special Committee Approves the Reclassification

At an August 20, 2015 meeting of Facebook's board, Zuckerberg formally proposed that Facebook issue a new class of non-voting shares, which would allow him to sell a substantial amount of stock without losing control of the company.[35] Zuckerberg also disclosed that he had hired Simpson Thacher & Bartlett LLP ("Simpson Thacher") to give him personal legal advice about "what creating a new class of stock might look like."[36]

A couple of days later, Facebook established a special committee, which was composed of three purportedly-independent directors: Andreessen, Bowles, and Desmond-Hellman (the "Special Committee").[37] The board charged the Special Committee with evaluating the Reclassification, considering alternatives, and making a recommendation to the full board.[38] The board also authorized the Special Committee to retain legal counsel, financial advisors, and other experts.[39]

Facebook management recommended and the Special Committee hired Wachtell, Lipton, Rosen & Katz ("Wachtell") as the committee's legal advisor.[40] Before meeting with the Special Committee, Wachtell called Zuckerberg's contacts at Simpson Thacher to discuss the potential terms of the Reclassification.[41] Simpson Thacher rejected as non-starters

---

[35] A26.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] A27.
[41] A29.

several features from the Google playbook, such as a stapling provision that would have required Zuckerberg to sell a share of his voting stock each time that he sold a share of the non-voting stock, and a true-up payment that would compensate Facebook's other stockholders for the dilution of their voting power.[42]  By the time Wachtell first met with the Special Committee, the key contours of the Reclassification were already taking shape, and the Special Committee anticipated that the Reclassification would occur.  Thus, the Special Committee focused on suggesting changes to the Reclassification rather than considering alternatives or threatening to reject the plan.[43]

Following the recommendation of Bowles, the Special Committee hired Evercore Group L.L.C. ("Evercore") as its financial advisor.[44]  Evercore was founded by Roger Altman, a personal friend of Bowles who had helped him with various political efforts.[45]  Evercore's team leader observed that it had been hired "in the second inning" and that negotiations were well underway before it began to advise the Special Committee on the Reclassification.[46]

As the negotiations progressed, the Special Committee largely agreed to give Zuckerberg the terms that he wanted and did not consider alternatives or demand meaningful

---

[42] *Id.*; *see United Food & Commercial Workers Union v. Zuckerberg*, 250 A.3d 862, 871 (Del. Ch. 2020) (hereinafter, "Op. at__").
[43] *Id.*
[44] A30.
[45] *Id.*
[46] *Id.*

concessions.[47]  For example, the Special Committee did not ask Zuckerberg to revisit any of the terms that Simpson Thacher identified as non-starters and did not try to place restrictions on Zuckerberg's ability to sell as much stock as he wanted, for whatever purpose, on any timetable that he desired.[48]  Similarly, the Special Committee asked for only small concessions from Zuckerberg, such as a sunset provision that was designed to discourage Zuckerberg from leaving the company despite the absence of any demonstrable reason to believe that Zuckerberg would step away from his existing Facebook duties.[49]

On November 9, 2015, Zuckerberg publicly reaffirmed the Giving Pledge.[50]  The next day, Zuckerberg circulated a draft announcement within Facebook that would disclose his intent to begin making large annual donations to complete the pledge.[51]  Zuckerberg asked for feedback on the announcement from various people, including Desmond-Hellman.[52]  Zuckerberg also informed Bowles and Andreessen of his planned announcement.[53]  Bowles and Andreessen told Zuckerberg that they were "proud" of him for taking the Giving Pledge and announcing his plan to begin donating his wealth to philanthropic causes.[54]  Zuckerberg also told Warren Buffett, Bill Gates, and Melinda Gates

---

[47] *See* A30-40.
[48] A31-32.
[49] A41.
[50] A33.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

of his planned announcement.[55]  Melinda Gates forwarded an email that she received from Zuckerberg to Desmond-Hellman, adding a smiley-face emoji.[56]  At that time, Desmond-Hellman was the chief executive officer of the Gates Foundation.[57]

A few weeks later, Zuckerberg published a post on his Facebook page announcing that he planned to begin making large donations of his Facebook stock.[58]  The post noted that Zuckerberg intended to "remain Facebook's CEO for many, many years to come"[59] and did not mention that his plan hinged on the Special Committee's approval of the Reclassification.[60]  The Special Committee did not try to use the public announcement as leverage to extract more concessions from Zuckerberg.[61]

Throughout the negotiations about the Reclassification, Andreessen engaged in facially dubious back-channel communications with Zuckerberg about the Special Committee's deliberations.[62]  For example, during a March 2016 teleconference with the Special Committee, Zuckerberg pushed for an eight-year leave of absence.[63]  Andreessen sent Zuckerberg text messages during the meeting that provided live updates on which lines

---

[55] *Id.*
[56] A34.
[57] A27.
[58] A34.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] A36-40.
[63] A38.

of argument were working[64] and which were not.[65]  When confronted with these text messages later on, Desmond-Hellmann agreed that it appeared Andreessen had been "coaching" Zuckerberg through the negotiations.[66]

On April 13, 2016, the Special Committee recommend that the full board approve the Reclassification.[67]  The next day, Facebook's full board accepted the Special Committee's recommendation and voted to approve the Reclassification.[68]  Zuckerberg and Sandberg abstained from voting on the Reclassification.[69]

### D.    Facebook Settles a Class Action Challenging the Reclassification

On April 27, 2016, Facebook revealed the Reclassification to the public.[70]  The announcement was timed to coincide with the company's best-ever quarterly earnings report.[71]  Evercore's project leader, Altman, sent Desmond-Hellmann an email remarking, "Anytime [Facebook] announces earnings like that, no one will care about an equity recapitalization."[72]

On April 29, 2016, the first class action was filed in the Court of Chancery challenging the Reclassification.[73]  Several more similar complaints were filed, and in May 2016 the

---

[64] *See, e.g.*, *id.* ("NOW WE'RE COOKING WITH GAS.").
[65] *See, e.g.*, *id.* ("This line of argument is not helping . . . .").
[66] *Id.*
[67] A41.
[68] *Id.*
[69] A41 n.4.
[70] A42.
[71] *Id.*
[72] A43.
[73] *Id.*

Court of Chancery consolidated thirteen cases into a single class action (the "Reclassification Class Action").[74]

On June 20, 2016, Facebook held its annual stockholders meeting.[75] Among other things, the stockholders were asked to vote on the Reclassification.[76] Zuckerberg voted all of his stock in favor of the plan.[77] Including Zuckerberg's votes, a majority of Facebook's stockholders approved the Reclassification.[78] More than three-quarters of the minority stockholders voted against the Reclassification.[79]

On June 24, 2016, Facebook agreed that it would not go forward with the Reclassification while the Reclassification Class Action was pending.[80] The Court of Chancery certified the Reclassification Class Action in April 2017 and tentatively scheduled the trial for September 26, 2017.[81] About a week before the trial was scheduled to begin, Zuckerberg asked the board to abandon the Reclassification.[82] The board agreed, and the next day Facebook filed a Form 8-K with the Securities and Exchange Commission disclosing that the company had abandoned the Reclassification and mooted the Class

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*

Action.[83]   The Form-8K also disclosed that despite abandoning the Reclassification, Zuckerberg planned to sell a substantial number of shares over the coming 18 months.[84]

In a companion Facebook post, Zuckerberg explained that he "knew [the Reclassification] was going to be complicated and [that] it wasn't a perfect solution."  The post continued, "Today I think we have a better one" that would allow Zuckerberg and his wife to "fully fund [our] philanthropy and retain voting control of Facebook for 20 years or more."[85]  The post also clarified that this new plan would not "change [our] plans to give away 99% of our Facebook shares during our lives.  In fact, we now plan to accelerate our work and sell more of those shares sooner."[86]  By January 3, 2019, Zuckerberg had sold about $5.6 billion worth of Facebook stock without the Reclassification.

### E. Tri-State Files a Class Action Seeking to Recoup the Money that Facebook Spent Defending and Settling the Reclassification Class Action

Facebook spent about $21.8 million defending the Reclassification Class Action, including more than $17 million on attorneys' fees.  Additionally, Facebook paid $68.7 million to the plaintiff's attorneys in the Reclassification Class Action to settle a claim under the corporate benefit doctrine.[87]

---

[83] A43-44.
[84] A44.
[85] *Id.*
[86] *Id.*
[87] A45.

On September 12, 2018, Tri-State filed a derivative action in the Court of Chancery seeking to recoup the money that Facebook spent defending and settling the Reclassification Class Action.[88] The complaint asserted a single count alleging that Zuckerberg, Andreessen, Thiel, Hastings, Bowles, and Desmond-Hellmann (collectively, the "Director Defendants") breached their fiduciary duties of care and loyalty by improperly negotiating and approving the Reclassification.[89] When Tri-State filed its complaint, Facebook's board was composed of nine directors: Zuckerberg, Andreessen, Bowles, Desmond-Hellman, Hastings, Thiel, Sandberg, Chenault, and Zients (collectively, the "Demand Board").[90]

The complaint alleged that demand was excused as futile under Court of Chancery Rule 23.1 because "the Reclassification was not the product of a valid exercise of business judgment" and because "a majority of the Board face[d] a substantial likelihood of liability[] and/or lack[ed] independence."[91] Facebook and the Director Defendants moved to dismiss the complaint under Court of Chancery Rule 23.1 for failing to comply with the demand requirement.[92]

On October 26, 2020, the Court of Chancery issued a memorandum opinion dismissing the complaint for failing to comply with Rule 23.1. The court held that demand was required because the complaint did not contain particularized allegations raising a

---

[88] Op. at 875.
[89] Id.
[90] A46.
[91] Id.
[92] Op. at 869.

reasonable doubt that a majority of the Demand Board received a material personal benefit from the Reclassification, faced a substantial likelihood of liability for approving the Reclassification, or lacked independence from another interested party.[93]

Tri-State appeals the Court of Chancery's judgment dismissing the derivative complaint under Rule 23.1 for failing to make a demand on the board or plead with particularity facts establishing that demand would be futile.

## II.    STANDARD OF REVIEW

"[O]ur review of decisions of the Court of Chancery applying Rule 23.1 is *de novo* and plenary."[94]

## III.    ANALYSIS

"A cardinal precept" of Delaware law is "that directors, rather than shareholders, manage the business and affairs of the corporation."[95]    This precept is reflected in Section 141(a) of the Delaware General Corporation Law ("DGCL"), which provides that "[t]he business and affairs of every corporation organized under this chapter *shall be managed by or under the direction of a board of directors* except as may be otherwise provided in this chapter or in [a corporation's] certificate of incorporation."[96]    The board's authority to govern corporate affairs extends to decisions about what remedial actions a

---

[93] *Id.* at 890-900.
[94] *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).
[95] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds* 746 A.2d 244 (Del. 2000).
[96] 8 *Del C.* § 141(a) (emphasis added).

corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider.[97]

"In a derivative suit, a stockholder seeks to displace the board's [decision-making] authority over a litigation asset and assert the corporation's claim."[98] Thus, "[b]y its very nature[,] the derivative action" encroaches "on the managerial freedom of directors" by seeking to deprive the board of control over a corporation's litigation asset.[99] "In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must" (1) make a demand on the company's board of directors or (2) show that demand would be futile.[100] The demand requirement is a substantive requirement that "'[e]nsure[s] that a stockholder exhausts his intracorporate remedies,' 'provide[s] a safeguard against strike suits,' and 'assure[s] that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur.'"[101]

---

[97] *See, e.g.*, *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017) (The board's "managerial decision making power . . . encompasses decisions whether to initiate, or refrain from entering, litigation." (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981)) (citing *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991); *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990); *Aronson*, 473 A.2d at 811)).

[98] Op. at 16.

[99] *Aronson*, 473 A.2d at 811.

[100] *Lenois*, 2017 WL 5289611 at *9.

[101] *Id.* (alterations in original) (first quoting *Aronson*, 473 A.2d at 811-12; and then quoting *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988)).

Court of Chancery Rule 23.1 implements the substantive demand requirement at the pleading stage by mandating that derivative complaints "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." To comply with Rule 23.1, the plaintiff must meet "stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings."[102] When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor.[103]

The plaintiff in this action did not make a pre-suit demand. Thus, the question before the Court is whether demand is excused as futile. This Court has articulated two tests to determine whether the demand requirement should be excused as futile: the *Aronson* test and the *Rales* test.[104] The *Aronson* test applies where the complaint challenges a decision made by the same board that would consider a litigation demand.[105] Under *Aronson*, demand is excused as futile if the complaint alleges particularized facts that raise a reasonable doubt that "(1) the directors are disinterested and independent[,] [or] (2) the challenged

---

[102] *Brehm*, 746 A.2d at 254.
[103] *See, e.g.*, *White v. Panic*, 783 A.2d 543, 549 (Del. 2001).
[104] *Aronson*, 473 A.2d at 805; *Rales*, 634 A.2d at 927.
[105] *See, e.g.*, *Rales*, 634 A.2d at 933.

transaction was otherwise the product of a valid business judgment."[106] This reflects the "rule . . . that where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation. Thus, demand would be futile."[107]

The *Rales* test applies in all other circumstances. Under *Rales*, demand is excused as futile if the complaint alleges particularized facts creating a "reasonable doubt that, as of the time the complaint is filed," a majority of the demand board "could have properly exercised its independent and disinterested business judgment in responding to a demand."[108] "Fundamentally, *Aronson* and *Rales* both 'address the same question of whether the board can exercise its business judgment on the corporat[ion]'s behalf' in considering demand."[109] For this reason, the Court of Chancery has recognized that the broader reasoning of *Rales* encompasses *Aronson*, and therefore the *Aronson* test is best understood as a special application of the *Rales* test.[110]

While Delaware law recognizes that there are circumstances where making a demand would be futile because a majority of the directors "are under an influence which sterilizes their discretion" and "cannot be considered proper persons to conduct litigation on behalf of

---

[106] *Aronson*, 473 A.2d at 814.
[107] *Id.* (citations omitted).
[108] *Rales*, 634 A.2d at 934.
[109] *Lenois*, 2017 WL 5289611, at *9 (quoting *Kaplan*, 540 A.2d at 730).
[110] *See, e.g.*, *Hughes v. Hu*, 2020 WL 1987029, at *12 (Del. Ch. Apr. 27, 2020); *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at *11 (Del. Ch. May 13, 2016); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006).

the corporation,"[111] the demand requirement is not excused lightly because derivative litigation upsets the balance of power that the DGCL establishes between a corporation's directors and its stockholders. Thus, the demand-futility analysis provides an important doctrinal check that ensures the board is not improperly deprived of its decision-making authority, while at the same time leaving a path for stockholders to file a derivative action where there is reason to doubt that the board could bring its impartial business judgment to bear on a litigation demand.

In this case, Tri-State alleged that demand was excused as futile for several reasons, including that the board's negotiation and approval of the Reclassification would not be "protected by the business judgment rule" because "[t]heir approval was not fully informed" or "duly considered,"[112] and that a majority of the directors on the Demand Board lacked independence from Zuckerberg.[113] The Court of Chancery held that Tri-State failed to plead with particularity facts establishing that demand was futile and dismissed the complaint because it did not comply with Court of Chancery Rule 23.1.[114]

---

[111] *Aronson*, 473 A.2d at 814.

[112] A47. The complaint also contains conclusory allegations that the Director Defendants acted in bad faith. *Id.* (The Director Defendants' "approval was not fully informed, not duly considered, *and was not made in good faith* for the best interests of Facebook."). On appeal, Tri-State concedes that the complaint did not plead with particularity that a majority of the Demand Board was subject to liability for acting in bad faith. *Compare* Op. at 895-900 (holding that the complaint did not allege with particularity bad faith claims against Hastings, Thiel, or Bowles) *with* Opening Br. (not contesting this holding). Accordingly, the Court does not address whether demand is excused as futile under the second prong of the *Aronson* test because a majority of the Demand Board committed *non-exculpated* breaches of their fiduciary duties.

[113] *See* A45-63.

[114] Op. at 900-01.

On appeal, Tri-State raises two issues with the Court of Chancery's demand-futility analysis. First, Tri-State argues that the Court of Chancery erred by holding that exculpated care violations do not satisfy the second prong of the *Aronson* test.[115] Second, Tri-State argues that its complaint contained particularized allegations establishing that a majority of the directors on the Demand Board were beholden to Zuckerberg.[116]

For the reasons provided below, this Court affirms the Court of Chancery's judgment.

## A. Exculpated Care Violations Do Not Satisfy *Aronson's* Second Prong

The directors and officers of a Delaware corporation owe two overarching fiduciary duties—the duty of care and the duty of loyalty.[117] "[P]redicated upon concepts of gross negligence," the duty of care requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties.[118] The duty of loyalty "'requires an undivided and unselfish loyalty to the corporation' and 'demands that there shall be no conflict between duty and self-interest.'"[119]

Tri-State alleges that the Director Defendants breached their duty of care in negotiating and approving the Reclassification. Section 102(b)(7) of the DGCL authorizes

---

[115] Opening Br. 23-36.

[116] *Id.* at 37-47.

[117] *See, e.g.*, *Dohmen v. Goodman*, 234 A.3d 1161 (Del. 2020) ("Directors of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders." (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006))); *Gantler v. Stephens*, 965 A.2d 695, 708-709 (Del. 2009) (holding "that corporate officers owe fiduciary duties that are identical to those owed by corporate directors").

[118] *See, e.g.*, *Aronson*, 473 A.2d at 812.

[119] *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 721 (Del. 2020) (citations omitted) (quoting *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939)).

23

corporations to adopt a charter provision insulating directors from liability for breaching their

duty of care:

> "[T]he certificate of incorporation may . . . contain any or all of
> the following matters:
>
> (7) A provision eliminating or limiting the personal
> liability of a director to the corporation or its stockholders for
> monetary damages for breach of fiduciary duty as a director,
> provided that such provision shall not eliminate or limit the
> liability of a director: (i) For any breach of the director's duty of
> loyalty to the corporation or its stockholders; (ii) for acts or
> omissions not in good faith or which involve intentional
> misconduct or a knowing violation of law; . . . or (iv) for any
> transaction from which the director derived an improper
> personal benefit.

Facebook's charter contains a Section 102(b)(7) clause;[120] as such, the Director

Defendants face no risk of personal liability from the allegations asserted in this action. Thus,

Tri-State's demand-futility allegations raise the question whether a derivative plaintiff can

rely on exculpated care violations to establish that demand is futile under the second prong

of the *Aronson* test. The Court of Chancery held that exculpated care claims do not excuse

demand because the second prong of the *Aronson* test focuses on whether a director faces a

substantial likelihood of liability.[121] Tri-State argues that this analysis was wrong because

---

[120] App. to Answering Br. 77 ("<u>Limitation of Liability</u>. To the fullest extent permitted by law, no director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. Without limiting the effect of the preceding sentence, if the General Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of a director, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law, as so amended." (emphasis removed)).

[121] Op. at 878-86.

*Aronson's* second prong focuses on whether the challenged transaction "satisfies the applicable standard of review," not on whether directors face a substantial likelihood of liability.[122]

The following discussion is divided into three parts. The first part affirms the Court of Chancery's holding that, in light of subsequent developments, exculpated care claims do not excuse demand under *Aronson's* second prong. The second part explains why Tri-State's counterarguments do not change our analysis. The third part adopts the Court of Chancery's three-part test as the universal test for demand futility.

### 1. The second prong of *Aronson* focuses on whether the directors face a substantial likelihood of liability

The main question on appeal is whether allegations of exculpated care violations can establish that demand is excused under *Aronson's* second prong. According to Tri-State, the second prong excuses demand whenever the complaint raises a reasonable doubt that the challenged transaction was a valid exercise of business judgment, regardless of whether the directors face a substantial likelihood of liability for approving the challenged transaction. Thus, exculpated care violations can establish that demand is futile.[123]

Tri-State's argument hinges on the plain language of *Aronson's* second prong, which focuses on whether "the challenged transaction was . . . the product of a valid business judgment":

---

[122] Opening Br. 26.
[123] *See id.* at 23-36.

25

> [I]n determining demand futility, the Court of Chancery . . . must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) *the challenged transaction was otherwise the product of a valid business judgment*. Hence, the Court of Chancery must make two inquiries, one into the independence and disinterestedness of the directors and *the other into the substantive nature of the challenged transaction and the board's approval thereof*.[124]

Later opinions issued by this Court contain similar language that can be read to suggest that *Aronson's* second prong focuses on the propriety of the challenged transaction.[125] These passages do not address, however, why *Aronson* used the standard of review as a proxy for whether the board could impartially consider a litigation demand. The likely answer is that, before the General Assembly adopted Section 102(b)(7) in 1995,[126] rebutting the business judgment rule through allegations of care violations exposed directors to a substantial likelihood of liability. Thus, even if the demand board was independent and

---

[124] *Aronson*, 473 A.2d at 814 (emphasis added).

[125] *See, e.g.*, *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991) ("Assuming a plaintiff cannot prove that directors are interested or otherwise not capable of exercising independent business judgment, a plaintiff in a demand futility case must plead particularized facts creating a reasonable doubt as to the 'soundness' of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *C.L. Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (One ground for alleging with particularity that demand would be futile is that a 'reasonable doubt' exists that the board is capable of making an independent decision to assert the claim if demand were made. The basis for claiming demand excusal would normally be that . . . *the underlying transaction* is not the product of a valid exercise of business judgment." (citations omitted)), *overruled on other grounds by Brehm*, 746 A.2d at 244. *But see Kaplan*, 540 A.2d at 732 ("The demand futility test established in *Aronson* provides a standard for determining whether the directors who approved the challenged transaction are under an influence which precludes them from being 'considered the proper persons to conduct the litigation on behalf of the corporation." (quoting *Aronson*, 473 A.2d at 814)).

[126] 1995 Delaware Laws Ch. 79 (S.B. 175).

disinterested with respect to the challenged transaction, the litigation presented a threat that would "sterilize [the board's] discretion" with respect to a demand.[127]

*Aronson* supports this conclusion. For example, in *Aronson* the Court noted that, although naming directors as defendants is not enough to establish that demand would be futile, "in rare cases *a transaction* may be so egregious on its face that board approval cannot meet the test of business judgment, and a *substantial likelihood of liability* therefore exists.... [I]n that context demand is excused."[128] This passage helps to illuminate the connection that the Court drew between rebutting the business judgment rule and the board's ability to consider a litigation demand. At that time, if the business judgment rule did not apply, allowing the derivative litigation to go forward would expose the directors to a substantial likelihood of liability for breach-of-care claims supported by well-pleaded factual allegations. It is reasonable to doubt that a director would be willing to take that personal risk. Thus, demand is excused.

On the other hand, if the business judgment rule would apply, allowing the derivative litigation to go forward would expose the directors to a minimal threat of liability. A remote threat of liability is not a good enough reason to deprive the board of control over the corporation's litigation assets. Thus, demand is required.

---

[127] *Aronson*, 473 A.2d at 814.

[128] *Id.* at 815 (emphasis added) (citing *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599 (Del. Ch. 1974), *aff'd* 316 A.2d 619; *Cottrell v. Pawcatuck, Co.*, 128 A.2d 225 (Del. 1956)).

Although not unanimous,[129] the weight of Delaware authority since the enactment of Section 102(b)(7) supports holding that exculpated care violations do not excuse demand under *Aronson's* second prong.[130] For example, in *Lenois*, the Court of Chancery held that the second prong focuses on whether director-defendants face a substantial likelihood of liability:

> [W]here an exculpatory charter provision exists, demand is excused as futile under the second prong of *Aronson* with a showing that a majority of the board faces a substantial likelihood of liability for non-exculpated claims. That a non-exculpated claim may be brought against less than a majority of the board or some other individual at the company, or that the board committed exculpated duty of care violations alone, will not affect the board's right to control a company's litigation.[131]

In reaching that conclusion, *Lenois* examined several other Court of Chancery decisions holding that Section 102(b)(7) provisions are relevant when assessing whether demand should be excused under *Aronson's* second prong:

- In *Higher Education Management Group, Inc v. Matthews*, the Court of Chancery noted that because the corporation's charter contained a Section 102(b)(7) provision, and the complaint did "not support an inference of bad faith conduct *by a majority of the Director Defendants*," demand was required because "there would be no recourse for Plaintiffs and no substantial likelihood of liability if the Director Defendants' only failing was that they had not become fully informed."[132]

---

[129] *See McPadden v. Sidhu*, 964 A.2d 1262, 1271-73 (Del. Ch. 2008) (holding that exculpated breach-of-care claims can excuse demand under the second prong of the *Aronson* test).
[130] *See, e.g.*, *Lenois*, 2017 WL 5289611, at *12-14 (collecting cases).
[131] *Id.* at *14.
[132] 2014 WL 5573325, at *11, *11 n.63 (Del. Ch. Nov. 3, 2014).

28

- In *Pfeiffer v. Leedle*, the Court of Chancery held that demand was "excused under the second prong of *Aronson*" because the board committed "breaches of the duty of loyalty" that "cannot be exculpated" under the charter.[133]

- In *In re Goldman Sachs*, the Court of Chancery noted that where a corporation's charter contains a Section 102(b)(7) provision, the second prong of *Aronson* requires that the plaintiff "plead particularized facts that demonstrate that the directors acted with scienter; i.e., there was an 'intentional dereliction of duty' or a 'conscious disregard' for their responsibilities, amount to bad faith."[134] In other words, to establish that making a demand would be futile under the second prong of *Aronson* a derivative complaint would have to raise a reasonable doubt that the directors faced a substantial likelihood of liability for committing *non-exculpated* breaches of their fiduciary duties.[135]

- In *In re Lear*, the Court of Chancery reached the same conclusion that where a corporation's charter has a Section 102(b)(7) provision, "the plaintiffs [must] plead particularized facts supporting an inference that the directors committed a breach of their fiduciary duty of loyalty" by "act[ing] in bad faith."[136]

- In *Disney I*, the Court of Chancery held that making a demand would be futile because the complaint raised a reasonable "doubt whether the board's actions were taken honestly and in good faith," exposing the directors to liability for non-exculpated breaches of their fiduciary duties.[137]

Several opinions issued after *Lenois* support the same analysis:[138]

- In *Ellis v. Gonzalez*, the Court of Chancery held that because the corporation's charter contained a Section 102(b)(7) provision, "under either *Aronson* or *Rales*, the question . . . is the same: Does the Complaint adequately allege that a majority of . . . [the] board faces a substantial likelihood of liability for breaching the duty of loyalty?"[139]

---

[133] 2013 WL 5988416, at *9 (Del. Ch. Nov. 8, 2013).

[134] 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011).

[135] *See id.*

[136] 967 A.2d 640, 657 (Del. Ch. 2008).

[137] 825 A.2d 275, 286 (Del. Ch. 2003).

[138] The Court acknowledges that some of the opinions applied the *Rales* test for demand futility.

[139] 2018 WL 3360816, at *6 (Del. Ch. July 10, 2018) (citations omitted).

- In *Steinberg v. Bearden*, the Court of Chancery's demand-futility analysis focused on whether "a majority of the Board face[d] a substantial threat of personal liability . . . such that the Board could not consider a demand impartially."[140]

This Court's opinion in *In re Cornerstone Therapeutics, Inc. Stockholder Litigation*, changed the landscape even more.[141] Before *Cornerstone*, there was some uncertainty about how to apply a Section 102(b)(7) provision when deciding a motion to dismiss under Court of Chancery Rule 12(b)(6). Some courts held that an exculpation clause could warrant dismissing a complaint alleging care claims.[142] Others, particularly where the entire fairness standard of review might apply, ruled that more factual development was needed to determine whether the director's breach would be exculpated.[143] Thus, a complaint alleging exculpated care violations *might* compromise a director's ability to impartially consider a litigation demand by exposing them to the distraction of protracted litigation, public scrutiny, and potential reputational harm, even if the risk was low that the director would be found liable for breaching their fiduciary duties.

---

[140] 2018 WL 2434558, at *8-9 (Del. Ch. May 30, 2018).

[141] 115 A.3d 1173, 1186-87 (Del. 2015) ("[W]hen the plaintiffs have pled no facts to support an inference that any of the independent directors breached their duty of loyalty, fidelity to the purpose of Section 102(b)(7) requires dismissal of the complaint against those directors.").

[142] *See, e.g.*, *Pfeiffer*, 2013 WL 5988416, at *9 (considering a 102(b)(7) provision when deciding to dismiss a complaint for failing to comply with Rule 23.1); *Malpiede v. Townson*, 780 A.2d 1075, 1094-96 (holding that the Court could apply a 102(b)(7) provision clause when considering a motion to dismiss a suit challenging an arm's length merger approved by disinterested stockholders).

[143] *See, e.g.*, *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) (holding that a Section 102(b)(7) provision did not justify granting summary judgment because there were disputed facts about whether the directors committed non-exculpated breaches of their fiduciary duties).

*Cornerstone* eliminated any uncertainty and held that where a corporation's charter contains a Section 102(b)(7) provision, "[a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct."[144] Thus, under current law a Section 102(b)(7) provision removes the threat of liability and protracted litigation for breach of care claims. As such, *Cornerstone* eliminated "any continuing vitality from *Aronson's* use of the standard of review for the challenged transaction as a proxy for whether directors face a substantial likelihood of liability sufficient to render demand futile."[145]

Accordingly, this Court affirms the Court of Chancery's holding that exculpated care claims do not satisfy *Aronson's* second prong. This Court's decisions construing *Aronson* have consistently focused on whether the demand board has a connection to the challenged transaction that would render it incapable of impartially considering a litigation demand.[146]

---

[144] *See Cornerstone*, 115 A.3d at 1186-87.

[145] Op. at 885.

[146] *See, e.g.*, *Levine*, 591 A.2d at 205 ("The premise of a shareholder claim of futility of demand is that a majority of the board of directors either has a financial interest in the challenged transaction or lacks independence or otherwise failed to exercise due care. On either showing, it may be inferred that the Board is *incapable* of exercising its power and authority to pursue the derivative claims directly."); *C.L. Grimes*, 673 A.2d at 1216 ("One ground for alleging with particularity that demand would be futile is that a 'reasonable doubt' exists that the board is capable of making an independent decision to assert the claim if demand were made." (quoting *Aronson*, 473 A.2d at 814)); *see also Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("A stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder (a) [makes a demand] . . .; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." (citation omitted)).

When *Aronson* was decided, raising a reasonable doubt that directors breached their duty of care exposed them to a substantial likelihood of liability and protracted litigation, raising doubt as to their ability to impartially consider demand. The ground has since shifted, and exculpated breach of care claims no longer pose a threat that neutralizes director discretion. These developments must be factored into demand-futility analysis, and Tri-State has failed to provide a reasoned explanation of why rebutting the business judgment rule should automatically render directors incapable of impartially considering a litigation demand given the current landscape. For these reasons, the Court of Chancery's judgment is affirmed.

### 2. Tri-State's other arguments do not change the analysis

Tri-State raises a few more counterarguments that do not change the Court's analysis.

First, Tri-State argues that construing the second prong of *Aronson* to focus on whether directors face a substantial likelihood of liability erases any distinction between the two prongs of the *Aronson* test.[147] The argument goes like this. If directors face a substantial likelihood of liability for approving the challenged transaction, then they are interested with respect to the challenged transaction. The first prong of *Aronson* already addresses whether directors are interested in the challenged transaction. Thus, construing the second prong to require a substantial risk of liability makes it redundant.[148] This argument misconstrues *Aronson*. The first prong of *Aronson* focuses on whether the directors had a personal interest

---

[147] *See* Opening Br. 27-28.
[148] *See id.*

32

in the challenged transaction (i.e., a personal financial benefit from the challenged transaction that is not equally shared by the stockholders).[149] This is a different consideration than whether the directors face a substantial likelihood of liability for approving the challenged transaction, even if they received nothing personal from the challenged transaction. The second prong excuses demand in that circumstance. Thus, the first and second prongs of *Aronson* perform separate functions, even if those functions are complementary.

Second, Tri-State argues that this holding places an unfair burden on plaintiffs and will fail to deter controllers from pressuring boards to approve unfair transactions.[150] Although not entirely clear, Tri-State appears to argue that because the entire fairness standard of review applies *ab initio* to a conflicted-controller transaction,[151] demand is automatically excused under *Aronson's* second prong. As the Court of Chancery noted below, some cases have suggested that demand is automatically excused under *Aronson's* second prong if the complaint raises a reasonable doubt that the business judgment standard of review will apply, even if the business judgment rule is rebutted for a reason unrelated to the conduct or interests of a majority of the directors on the demand board.[152] The Court of Chancery's case law developed in a different direction, however, concluding that demand is not futile under the second prong of *Aronson* simply because entire fairness applies *ab initio*

---

[149] 473 A.2d at 814.
[150] *See* Opening Br. 35-36.
[151] *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 428-29 (Del. 1997).
[152] Op. 880-882.

33

to a controlling stockholder transaction. As the Court of Chancery has explained, the theory that demand should be excused simply because an alleged controlling stockholder stood on both sides of the transaction is "inconsistent with Delaware Supreme Court authority that focuses the test for demand futility exclusively on the ability of a corporation's board of directors to impartially consider a demand to institute litigation on behalf of the corporation—including litigation implicating the interests of a controlling stockholder."[153]

Further, Tri-State's argument presumes that a stockholder has a general right to control corporate claims. Not so. The directors are tasked with managing the affairs of the corporation, including whether to file action on behalf of the corporation. A stockholder can only displace the directors if the stockholder alleges with particularity that "the directors are under an influence which sterilizes their discretion" such that "they cannot be considered proper persons to conduct litigation on behalf of the corporation."[154] As such, enforcing the demand requirement where a stockholder has only alleged exculpated conduct does not "undermine shareholder rights;" instead, it recognizes the delegation of powers outlined in the DGCL.

Finally, Tri-State's argument collapses the distinction between the board's capacity to consider a litigation demand and the propriety of the challenged transaction. It is entirely

---

[153] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107, at *1 (Del. Ch. July 13, 2015); *see, e.g.*, *In re BGC P'rs, Inc.*, 2019 WL 4745121, at *7-9 (Del. Ch. Sept. 30, 2019) (rejecting the plaintiff's argument that demand was automatically excused under *Aronson's* second prong because the derivative complaint challenged a conflicted-controller transaction).
[154] *Aronson*, 473 A.2d at 814.

34

possible that an independent and disinterested board, exercising its impartial business judgment, could decide that it is not in the corporation's best interest to spend the time and money to pursue a claim that is likely to succeed. Yet, Tri-State asks the Court to deprive directors and officers of the power to make such a decision, at least where the derivative action would challenge a conflicted-controller transaction. This rule may have its benefits, but it runs counter to the "cardinal precept" of Delaware law that independent and disinterested directors are generally in the best position to manage a corporation's affairs, including whether the corporation should exercise its legal rights.[155]

For these reasons, Tri-State cannot satisfy the demand requirement by pleading—for reasons unrelated to the conduct or interests of a majority of the directors on the demand board—that the entire fairness standard of review would apply to the Reclassification. Rather, to satisfy Rule 23.1, Tri-State must plead with particularity facts establishing that a majority of the directors on the demand board are subject to an influence that would sterilize their discretion with respect to the litigation demand.

Third, Tri-State argues that this holding is contrary to *Brehm v. Eisner*,[156] *H&N Management Group v. Couch*,[157] and *McPadden*.[158] This Court's opinion in *Brehm* contains language that can be read to suggest that the second prong of the *Aronson* test focuses on the

---

[155] *See Aronson*, 473 A.2d at 811.
[156] 746 A.2d 244 (Del. 2000).
[157] 2017 WL 3500245 (Del. Ch. Aug. 1, 2017).
[158] 964 A.2d at 1262.

propriety of the challenged transaction rather than on whether the directors face a substantial likelihood of liability for approving the transaction. For example, the Court's demand-futility analysis focused on duty of care violations even though the opinion was issued after the legislature adopted Section 102(b)(7) and it appears that Disney's corporate charter had an exculpation clause.[159] Nonetheless, the Court did not hold that exculpated claims can establish demand futility,[160] and on remand the plaintiff relied on *non-exculpated* claims to establish that demand was futile.[161] Thus, *Brehm* did not hold that exculpated care violations can excuse demand under *Aronson's* second prong.

*H&N Management* is inapposite because the corporation's charter did not exculpate directors for breaches of the duty of care.[162] Thus, the Court of Chancery did not address whether exculpated claims could excuse demand under the second prong of the *Aronson* test.

This leaves *McPadden*, which appears to be the only Delaware decision squarely holding that exculpated care violations can excuse demand under the second prong of *Aronson*.[163] It is understandable that the Court of Chancery reached this holding given the

---

[159] *See Brehm*, 746 A.2d at 259 ("Pre-suit demand will be excused in a derivative suit only if the Court of Chancery in the first instance, and this Court in its *de novo* review, conclude that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decision[-]making process, *measured by concepts of gross negligence*, included consideration of all material information reasonably available."); *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 290 (Del. Ch. 2003) (stating that Disney had an exculpation clause).
[160] *Brehm*, 746 A.2d at 262-63.
[161] *In re Walt Disney*, 825 A.2d at 289-90.
[162] 2017 WL 3500245, at *7 ("Defendants do not benefit from a provision that exculpates them for grossly negligent conduct . . . .").
[163] 964 A.2d at 1270-75 (holding that demand was excused under the second prong of *Aronson* "because plaintiff has pleaded a duty of care violation with particularity sufficient to create a

36

plain language of *Aronson*. Nonetheless, given the subsequent developments in Delaware law, it is our view that exculpated care violations no longer pose a sufficient threat to excuse demand under the second prong of the *Aronson* test. Rather, the second prong requires particularized allegations raising a reasonable doubt that a majority of the demand board is subject to a sterilizing influence because directors face a substantial likelihood of liability for engaging in the conduct that the derivative claim challenges.

### 3. This Court adopts the Court of Chancery's three-part test for demand futility

This issue raises one more question—whether the three-part test for demand futility the Court of Chancery applied below is consistent with *Aronson*, *Rales*, and their progeny. The Court of Chancery noted that turnover on Facebook's board, along with a director's decision to abstain from voting on the Reclassification, made it difficult to apply the *Aronson* test to the facts of this case:

> The composition of the Board in this case exemplifies the difficulties that the *Aronson* test struggles to overcome. The Board has nine members, six of whom served on the Board when it approved the Reclassification. Under a strict reading of *Rales*, because the Board does not have a new majority of directors, *Aronson* provides the governing test. But one of those six directors abstained from the vote on the Reclassification, meaning that the *Aronson* analysis only has traction for five of the nine. *Aronson* does not provide guidance about what to do with either the director who abstained or the two directors who joined the Board later. The director who abstained from voting on the Reclassification suffers from other conflicts that renders

---

reasonable doubt that the transaction at issue was the product of a valid exercise of business judgment," but dismissing the complaint as to certain directors due to a Section 102(b)(7) provision).

37

her incapable of considering a demand, yet a strict reading of *Aronson* only focuses on the challenged decision and therefore would not account for those conflicts. Similarly, the plaintiff alleges that one of the directors who subsequently joined the Board has conflicts that render him incapable of considering a demand, but a strict reading of *Aronson* would not account for that either. Precedent thus calls for applying *Aronson*, but its analytical framework is not up to the task. The *Rales* test, by contrast, can accommodate all of these considerations.[164]

The court also suggested that in light of the developments discussed above, "*Aronson* is broken in its own right because subsequent jurisprudential developments have rendered non-viable the core premise on which *Aronson* depends—the notion that an elevated standard of review standing alone results in a substantial likelihood of liability sufficient to excuse demand. Perhaps the time has come to move on from *Aronson* entirely."[165]

To address these concerns, the Court of Chancery applied the following three-part test on a director-by-director basis to determine whether demand should be excused as futile:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

> (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand

---

[164] Op. at 890.
[165] *Id.* at 889-90.

> or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[166]

This approach treated "*Rales* as the general demand futility test," while "draw[ing] upon *Aronson*-like principles when evaluating whether particular directors face a substantial likelihood of liability as a result of having participated in the decision to approve the Reclassification."[167]

This Court adopts the Court of Chancery's three-part test as the universal test for assessing whether demand should be excused as futile. When the Court decided *Aronson*, it made sense to use the standard of review to assess whether directors were subject to an influence that would sterilize their discretion with respect to a litigation demand. Subsequent changes in the law have eroded the ground upon which that framework rested. Those changes cannot be ignored, and it is both appropriate and necessary that the common law evolve in an orderly fashion to incorporate those developments. The Court of Chancery's three-part test achieves that important goal. Blending the *Aronson* test with the *Rales* test is appropriate because "both 'address the same question of whether the board can exercise its business judgment on the corporat[ion]'s behalf' in considering demand";[168] and the refined test does not change the result of demand-futility analysis.[169]

---

[166] *Id.* at 890.

[167] *Id.*

[168] *Lenois*, 2017 WL 5289611, at *9 (quoting *Kaplan*, 540 A.2d at 730).

[169] If a director is interested in the challenged transaction—or lacks independence from someone else who is interested in the transaction—then the first prong of *Aronson* excuses demand with respect to that director. *Aronson*, 473 A.2d at 814. The first and third prongs of the refined three-

Further, the refined test "refocuses the inquiry on the decision regarding the litigation demand, rather than the decision being challenged."[170] Notwithstanding text focusing on the propriety of the challenged transaction, this approach is consistent with the overarching concern that *Aronson* identified: whether the directors on the demand board "cannot be considered proper persons to conduct litigation on behalf of the corporation" because they "are under an influence which sterilizes their discretion."[171] The purpose of the demand-futility analysis is to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand. That is a different consideration than whether the derivative claim is strong or weak because the challenged transaction is likely to pass or fail the applicable standard of review. It is helpful to keep those inquiries separate. And the Court of Chancery's three-part test is particularly helpful where, like here, board turnover and director abstention make it difficult to apply the *Aronson* test as written.

Finally, because the three-part test is consistent with and enhances *Aronson*, *Rales*, and their progeny, the Court need not overrule *Aronson* to adopt this refined test, and cases properly construing *Aronson*, *Rales*, and their progeny remain good law.

___

part test yield the same result. Op. at 890. Similarly, if the derivative litigation would expose a director to a substantial likelihood of liability, then the demand requirement is excused as futile with respect to that director under the second prong of the *Aronson* test and the second prong of the refined test. *See Aronson*, 473 A.2d at 814; Op. at 890. Thus, the refined three-part test excuses demand whenever the *Aronson* test would excuse demand.

[170] Op. at 887.

[171] *Aronson*, 473 A.2d at 814.

Accordingly, from this point forward, courts should ask the following three questions

on a director-by-director basis when evaluating allegations of demand futility:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

If the answer to any of the questions is "yes" for at least half of the members of the demand

board, then demand is excused as futile. It is no longer necessary to determine whether the

*Aronson* test or the *Rales* test governs a complaint's demand-futility allegations.

## B. The Complaint Does Not Plead with Particularity Facts Establishing that Demand Would Be Futile

The second issue on appeal is whether Tri-State's complaint pleaded with

particularity facts establishing that a litigation demand on Facebook's board would be futile.

The Court resolves this issue by applying the three-part test adopted above on a director-by-

director basis.

The Demand Board was composed of nine directors. Tri-State concedes on appeal

that two of those directors, Chenault and Zients, could have impartially considered a

41

litigation demand.[172]  And Facebook does not argue on appeal that Zuckerberg, Sandberg, or Andreessen could have impartially considered a litigation demand.[173]  Thus, in order to show that demand is futile, Tri-State must sufficiently allege that two of the following directors could not impartially consider demand:  Thiel, Hastings, Bowles, and Desmond-Hellmann.

Tri-State concedes on appeal that neither Thiel, Hastings, Bowles, nor Desmond-Hellmann had a personal interest in the Reclassification.[174]  This eliminates the possibility that demand could be excused under the first prong of the demand-futility test, as none of the remaining four directors obtained a material personal benefit from the alleged misconduct that is the subject of the litigation demand.

Similarly, there is no dispute that Facebook has a broad Section 102(b)(7) provision;[175] and Tri-State concedes on appeal that the complaint does not plead with particularity that Thiel, Hastings, Bowles, or Desmond-Hellmann committed a *non-exculpated* breach of their fiduciary duties with respect to the Reclassification.[176]  This

---

[172] *Compare* Op. at 895-900 (holding that the complaint did not establish that Chenault or Zients lacked independence) *with* Opening Br. (not challenging that holding).

[173] *Compare* Op. at 893 (assuming that Zuckerberg, Sandberg, and Andreessen were incapable of impartially considering a litigation demand) *with* Answering Br. (neither conceding nor challenging that assumption for the purpose of considering the motion to dismiss).

[174] *Compare* Op. 892-901 (holding that the complaint did not allege that these directors had a personal interest); *with* Opening Br. (not contesting that holding).

[175] *See, e.g.*, App. to Answering Br. 77.

[176] *Compare* Op. 892-901(holding that the complaint did not allege with particularity that these directors committed *non-exculpated* breaches of their fiduciary duties); *with* Opening Br. (not contesting that holding).

eliminates the possibility that demand could be excused under the second prong of the demand-futility test, as none of the remaining four directors would face a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand.

This leaves one unanswered question: whether the complaint pleaded with particularity facts establishing that two of the four remaining directors lacked independence from Zuckerberg.

"The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences."[177]  Whether a director is independent "is a fact-specific determination" that depends upon "the context of a particular case."[178]  To show a lack of independence, a derivative complaint must plead with particularity facts creating "a reasonable doubt that a director is . . . so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'"[179]

---

[177] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) (citing *Rales*, 634 A.2d at 936); *see also Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("At the pleading stage, a lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'" (quoting *Del. C'ty Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015))).

[178] *Beam*, 845 A.2d at 1049.

[179] *Id.* at 1050 (quoting *Rales*, 634 A.2d at 936).

"A plaintiff seeking to show that a director was not independent must satisfy a materiality standard."[180] The plaintiff must allege that "the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties."[181] In other words, the question is "whether, applying a subjective standard, those ties were *material*, in the sense that the alleged ties could have affected the impartiality of the individual director."[182] "Our law requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence."[183] And while "the plaintiff is bound to plead particularized facts in . . . a derivative complaint, so too is the court bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought."[184]

"A variety of motivations, including friendship, may influence the demand futility inquiry. But, to render a director unable to consider demand, a relationship must be of a bias-

---

[180] *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995)); *Brehm*, 746 A.2d at 259 n.49), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 88 A.3d 635 (Del. 2018).
[181] *Id.*
[182] *Id.* (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del.1995); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del.1993); *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996)).
[183] *Sandys*, 152 A.3d at 128 (quoting *Sanchez*, 124 A.3d at 1024 n.25).
[184] *Id.*

producing nature."[185] Alleging that a director had a "personal friendship" with someone else, or that a director had an "outside business relationship," are "insufficient to raise a reasonable doubt" that the director lacked independence.[186] "Consistent with [the] predicate materiality requirement, the existence of some financial ties between the interested party and the director, without more, is not disqualifying."[187]

Like the Court of Chancery below, we hold that Tri-State failed to raise a reasonable doubt that either Thiel, Hastings, or Bowles was beholden to Zuckerberg.[188]

### 1. Hastings

The complaint does not raise a reasonable doubt that Hastings lacked independence from Zuckerberg. According to the complaint, Hastings was not independent because:

- "Netflix purchased advertisements from Facebook at relevant times," and maintains "ongoing and potential future business relationships with" Facebook.[189]

- According to an article published by *The New York Times*, Facebook gave to Netflix and several other technology companies "more intrusive access to users' personal data than it ha[d] disclosed, effectively exempting those partners from privacy rules."[190]

- "Hastings (as a Netflix founder) is biased in favor of founders maintaining control of their companies."[191]

---

[185] *Beam*, 845 A.2d at 1050.
[186] *Id.*
[187] *M&F Worldwide*, 88 A.3d at 649.
[188] Because the complaint failed to raise a reasonable doubt that Hastings, Thiel, or Bowles were not independent, this Opinion need not address whether Desmond-Hellmann was beholden to Zuckerberg.
[189] A60.
[190] A61.
[191] A60.

45

- "Hastings has . . . publicly supported large philanthropic donations by founders during their lifetimes. Indeed, both Hastings and Zuckerberg have been significant contributors . . . [to] a well-known foundation known for soliciting and obtaining large contributions from company founders and which manages donor funds for both Hastings . . . and Zuckerberg . . . ."[192]

These allegations do not raise a reasonable doubt that Hastings was beholden to Zuckerberg. Even if Netflix purchased advertisements from Facebook, the complaint does not allege that those purchases were material to Netflix or that Netflix received anything other than arm's length terms under those agreements. Similarly, the complaint does not make any particularized allegations explaining how obtaining special access to Facebook user data was material to Netflix's business interests, or that Netflix used its special access to user data to obtain any concrete benefits in its own business.

Further, having a bias in favor of founder-control does not mean that Hastings lacks independence from Zuckerberg. Hastings might have a good-faith belief that founder control maximizes a corporation's value over the long-haul. If so, that good-faith belief would play a valid role in Hasting's exercise of his impartial business judgment.[193]

Finally, alleging that Hastings and Zuckerberg have a track record of donating to similar causes falls short of showing that Hastings is beholden to Zuckerberg. As the Court

---

[192] *Id.*

[193] *See generally Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*18 (Del. Ch. Apr. 14, 2017) ("[T]he fiduciary relationship requires that the directors act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the providers of presumptively permanent equity capital, as warranted for an entity with a presumptively perpetual life in which the residual claimants have locked in their investment." (citation omitted)).

of Chancery noted below, "[t]here is no logical reason to think that a shared interest in philanthropy would undercut Hastings' independence. Nor is it apparent how donating to the same charitable fund would result in Hastings feeling obligated to serve Zuckerberg's interests."[194] Accordingly, the Court affirms the Court of Chancery's holding that the complaint does not raise a reasonable doubt about Hastings's independence.

### 2.    Thiel

The complaint does not raise a reasonable doubt that Thiel lacked independence from Zuckerberg. According to the complaint, Thiel was not independent because:

- "Thiel was one of the early investors in Facebook," is "its longest-tenured board member besides Zuckerberg," and "has . . . been instrumental to Facebook's business strategy and direction over the years."[195]

- "Thiel has a personal bias in favor of keeping founders in control of the companies they created . . . ."[196]

- The venture capital firm at which Thiel is a partner, Founders Fund, "gets 'good deal flow'" from its "high-profile association with Facebook."[197]

- "According to Facebook's 2018 Proxy Statement, the Facebook shares owned by the Founders Fund (*i.e.*, by Thiel and Andreessen) will be released from escrow in connection with" an acquisition.[198]

- "Thiel is Zuckerberg's close friend and mentor."[199]

- In October 2016, Thiel made a $1 million donation to an "organization that paid [a substantial sum to] Cambridge Analytica" and "cofounded the Cambridge

---

[194] Op. at 896.
[195] A57-58.
[196] A58.
[197] *Id.*
[198] *Id.*
[199] A57.

Analytica-linked data firm Palantir."[200]  Even though "[t]he Cambridge Analytica scandal has exposed Facebook to regulatory investigations"[201] and litigation, Zuckerberg did not try to remove Thiel from the board.

- Similarly, Thiel's "acknowledge[ment] that he secretly funded various lawsuits aimed at bankrupting [the] news website Gawker Media" lead to "widespread calls for Zuckerberg to remove Thiel from Facebook's Board given Thiel's apparent antagonism toward a free press."[202]  Zuckerberg ignored those calls and did not seek to remove Thiel from Facebook's board.

These allegations do not raise a reasonable doubt that Thiel is beholden to Zuckerberg.  The complaint does not explain why Thiel's status as a long-serving board member, early investor, or his contributions to Facebook's business strategy make him beholden to Zuckerberg.  And for the same reasons provided above, a director's good faith belief that founder controller maximizes value does not raise a reasonable doubt that the director lacks independence from a corporation's founder.

While the complaint alleges that Founders Fund "gets 'good deal flow'" from Thiel's "high-profile association with Facebook,"[203] the complaint does not identify a single deal that flowed to—or is expected to flow to—Founders Fund through this association, let alone any deals that would be material to Thiel's interests.  The complaint also fails to draw any connection between Thiel's continued status as a director and the vesting of Facebook stock

---

[200] A59.

[201] *Id.*

[202] *Id.*

[203] A58.

48

related to the acquisition. And alleging that Thiel is a personal friend of Zuckerberg is insufficient to establish a lack of independence.[204]

The final pair of allegations suggest that because "Zuckerberg stood by Thiel" in the face of public scandals, "Thiel feels a sense of obligation to Zuckerberg."[205] These allegations can only raise a reasonable doubt about Thiel's independence if remaining a Facebook director was financially or personally material to Thiel. As the Court of Chancery noted below, given Thiel's wealth and stature, "[t]he complaint does not support an inference that Thiel's service on the Board is financially material to him. Nor does the complaint sufficiently allege that serving as a Facebook director confers such cachet that Thiel's independence is compromised."[206] Accordingly, this Court affirms the Court of Chancery's holding that the complaint does not raise a reasonable doubt about Thiel's independence.

### 3. Bowles

The complaint does not raise a reasonable doubt that Bowles lacked independence from Zuckerberg. According to the complaint, Thiel was not independent because:

- "Bowles is beholden to the entire board" because it granted "a waiver of the mandatory retirement age for directors set forth in Facebook's Corporate Governance Guidelines," allowing "Bowles to stand for reelection despite having reached 70 years old before" the May 2018 annual meeting.[207]

---

[204] *See, e.g.*, *Beam*, 845 A.2d at 1050.
[205] Op. at 898.
[206] *Id.* at 898-99.
[207] A56-57.

49

- "Morgan Stanley—a company for which [Bowles] . . . served as a longstanding board member at the time (2005-2017)—directly benefited by receiving over $2 million in fees for its work . . . in connection with the Reclassification . . . ."[208]

- Bowles "ensured that Evercore and his close friend Altman financially benefitted from the Special Committee's engagement" without properly vetting Evercore's competency or considering alternatives.[209]

These allegations do not raise a reasonable doubt that Bowles is beholden to Zuckerberg or the other members of the Demand Board. The complaint does not make any particularized allegation explaining why the board's decision to grant Bowles a waiver from the mandatory retirement age would compromise his ability to impartially consider a litigation demand or engender a sense of debt to the other directors. For example, the complaint does not allege that Bowles was expected to do anything in exchange for the waiver, or that remaining a director was financially or personally material to Bowles.

The complaint's allegations regarding Bowles's links to financial advisors are similarly ill-supported. None of these allegations suggest that Bowles received a personal benefit from the Reclassification, or that Bowles's ties to these advisors made him beholden to Zuckerberg as a condition of sending business to Morgan Stanley, Evercore, or his "close friend Altman."[210] Accordingly, this Court affirms the Court of Chancery's holding that the complaint does not raise a reasonable doubt about Bowles's independence.[211]

---

[208] A57.

[209] *Id.*

[210] *Id.*

[211] The factual section of the complaint also alleges that "Bowles privately told Zuckerberg" that Bowles was "proud to be a small part of [Zuckerberg's] life" after learning about Zuckerberg's plan

50

## IV.   CONCLUSION

For the reasons provided above, the Court of Chancery's judgment is affirmed.

---

to make accelerated donations to fulfill his pledge. *See* A33. Tri-State did not repeat this allegation in the portion of the complaint addressing demand futility. *See* A56-57. It is therefore unclear whether the complaint relies on this assertion to establish that Bowles lacks independence. Nonetheless, Tri-State has argued below and on appeal that Bowles's expression of gratitude is "hardly a sign of director independence" and is "a harbinger of [his] flawed tenure on the Special Committee." Opening Br. 43. To the extent Tri-State intended to rely on this allegation to help establish that demand is futile, this Court agrees entirely with the Court of Chancery's analysis. "These allegations suggest that Zuckerberg and Bowles had a collegial relationship, which is not sufficient to compromise Bowles's independence." 250 A.3d at 899; *see also Beam*, 845 A.2d at 1050 (noting that the existence of a "personal friendship" is insufficient to establish that a director is not independent).